MEMORANDUM OF DECISION RE: TERMINATION OF PARENTAL RIGHTS PETITION
I. INTRODUCTION
This case arises out of a petition filed with the Superior Court for Juvenile Matters in Willimantic on November 29, 2001, by the Department of Children and Families (hereinafter referred to as the "petitioner" or "department") whereby the department seeks the termination of the parental rights of Michelle L. and Phillip D. to their now three year old son, Lucas D., who was born September 24, 1999. Lucas' parents will be referred to herein as mother or father and collectively as the "respondents."
On the second day of trial. mother executed an affidavit consenting to the termination of her parental rights which, after a full canvass in the presence of her attorney, resulted in a finding by the court (Lopez, J.) that said consent was knowingly and voluntarily made and was a valid ground for the termination of her parental rights. A finding that termination of her parental rights is in the best interests of her son was deferred pending the decision as to father. Neither mother or her attorney desired to further participate in the trial.
II. HISTORY OF PROCEEDINGS:
Court proceedings originated in Willimantic on November 10, 1999, when the department filed a petition against the respondents alleging that Lucas was a neglected child in that he was being denied the proper care and attention physically, emotionally or morally and was being permitted to live under conditions, circumstances or associations injurious to his well-being. General Statutes § 46b-120 (8) (B) (C) [now § 46b-120
(9) (B) (C)]. On the day the neglect petition was filed, an order of CT Page 15334-do temporary custody was issued by the court (Mack, J.), which order was continued on November 15, 1999 (Mack, J.). On December 20, 1999, the child was adjudicated by the court (Mack, J.) as neglected under (8) (C) [now (9) (C)] of said statute after respondents pled nolo contendre. The court then vested Lucas' custody and guardianship in the child's paternal uncle, who resided in Massachusetts. with supervised visitation to the respondents. On April 19, 2000, the court (Mack, J.) restored custody and guardianship to the respondents. however, the court also entered an order of protective supervision for six months. On August 8, 2000, the court (Mack, J.) issued a second order of temporary custody which order was continued on August 18, 2000 at the Child Protection Session (Quinn, J.). On August 25, 2000, a third order of temporary' custody was issued (Sferrazza, J.) which order was confirmed on August 29, 2000 (Mack, J.). Lucas was committed to the care and custody of the department on January 24, 2001 (Mack, J.). Said commitment. which was initially for a period of one year. was ordered to be maintained until further order of the court on January 16, 2002 (Mack, J.) and remains in effect.[2]
On August 8, 2001, the court (Mack, J.), pursuant to a request by the petitioner and after hearing from counsel for each of the parties, approved the department's permanency plan which included termination of parental rights and adoption and found that further efforts by the department to reunify Lucas with his mother and father were no longer appropriate. The department was ordered to file the termination petition within sixty days of that date.[3] On January 16, 2002, the court (Mack, J.) again approved the same permanency plan without objection by counsel for mother and father, each of whom were also present for the hearing. The court also found that the department had made reasonable efforts to achieve said plan.
Trial of the termination petition was held on ten days in 2002, to wit, August 12, 13, 14, and 15; September 10, 11, 16, 18, 23 and 24. The court finds that mother and father have appeared and that each of respondents and the child were represented by counsel. The court has jurisdiction in the matter. There is no proceeding pending elsewhere affecting the custody of Lucas. Although Michelle L. has consented to the termination of her parental rights, Phillip D. remains steadfastly opposed to the termination of his parental rights. Pursuant to General Statutes § 17a-112 (j) (3) (B) (i) the petitioner alleges as the sole statutory ground for termination that Lucas has been found in a prior proceeding to have been neglected and that the respondent father has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, father could assume a responsible position in the life of said child. CT Page 15334-dp
During the trial, the court heard testimony from seventeen witnesses. The nine witnesses called by the petitioner included an evaluating psychologist, two therapists, two state troopers, a probation officer, two department case workers and Lucas' foster mother. Called by father were an evaluating psychologist, an evaluating/treating psychologist, two therapists, a domestic violence coordinator, a visitation supervisor and a family friend. Father also testified. The child's attorney called no witnesses. Forty-six exhibits were received in evidence from the parties. including eighteen from the petitioner. twenty-four from father and four from the child. There were two court exhibits consisting of father's treatment records from 1996 and a telephone message the court received on the third day of trial regarding father's extreme tardiness. The court took judicial notice of the affidavits supporting each of the orders of temporary custody and the specific steps issued by the court to the respondents. The court. after reading the termination petition and summary of adjudicatory facts filed herewith. reviewing each of the exhibits, considering the testimony of each of the witnesses. assessing the credibility of all witnesses and considering the arguments of counsel does make the following findings.
III. FACTS:
 A. Events Preceding Removal of Child
On September 26, 1999, two days after Lucas was born, the department received a referral from Backus Hospital which indicated that both mother and child tested positive for cocaine and marijuana. While the department was involved as a result of that referral, the child's maternal grandmother alleged that father had hit and kicked mother while she was holding then six week old Lucas and that respondents continued to use drugs. Both father and mother subsequently denied both allegations. however, several days thereafter, mother admitted that father tried to hit her and that she was continuing to smoke marijuana. When the investigative worker confronted father with the information, father became hostile, argumentative and verbally abusive to the worker. Father admitted, however, to "pushing matches" with mother and disclosed his twenty year history of smoking marijuana. In November, 1999, the department received information from the state police as to father's previous domestic violence arrests and as to other complaints of father's abusive conduct not pursued by mother. On November 10, 1999, father tested positive for marijuana resulting in a therapeutic recommendation for outpatient treatment that father refused. As a result of the above history, the first order of temporary custody was sought and issued on that date and Lucas was removed from his parents' care. At the time of CT Page 15334-dq Lucas' removal, respondents were living together in a single family dwelling owned by father. Father was age 38 and was a licensed and practicing chiropractor. Mother was age 23 and was father's office manager. The couple's relationship was of three years duration without the benefit of marriage.
 B. Events Resulting in Child's Commitment
Five days before Christmas, 1999, the child was adjudicated as neglected and custody and guardianship was transferred to father's brother, apparently as a result of an agreement reached by the parties and approved by the court. The paternal grandmother was to provide daycare and she or the paternal uncle were to supervise parental visits. On March 23, 2000, the petitioner filed a motion seeking modification of the disposition as father and mother were refusing to properly address their substance abuse and father had been arrested for drunk driving. The child. contrary to the court-ordered disposition. was residing with the respondents. That motion was addressed by the court on April 19, 2000, when, presumably, by way of another agreement, custody and guardianship were restored to the respondents. The court, however, also imposed protective supervision for a period of six months with the department as the supervising agency.[4] Pursuant to General Statutes § 46b-129
(j) the court issued certain conditions to the protective supervision. Mother and father were ordered to engage in substance abuse treatment, submit to random urinalysis and address domestic violence issues. In addition, father was to pursue anger management therapy. As to the drug testing. the time and method of testing was left to the department. The ensuing three and a half months were characterized by the failure of respondents to comply not only with the court-ordered conditions, but, in father's case, also with very specific court-ordered testing procedures. Mother failed to report for scheduled treatment and father was discharged by service providers for failure to comply and for manipulation of services. As a result of this non-compliance, a second order of temporary custody issued resulting. once again, in Lucas' removal from parental care. That order was vacated by agreement by Judge Quinn at this court in August 18, 2000, whereby Lucas was returned to mother on condition that father would vacate the premises. have supervised visitation only, access appropriate drug counseling and testing services, address his domestic violence and anger issues and comply with the court-ordered conditions. Mother was to remain drug free and cooperate with the department.
Seven days after Lucas was returned to his mother's care, the third order of temporary custody was entered and the child was removed from parental care a third time! This order was prompted by fathers positive test for alcohol and mother's hair test which was positive for cocaine. CT Page 15334-dr Mother's evaluating therapist reported mother's test indicated a usage level of two to four grams a month which would pose serious risk to Lucas due to the drug-induced impairment of her ability to tend to her child's physical and emotional needs. On August 29, 2000, the third order of temporary custody was sustained. The child was to remain in department custody pending mother's successful completion of an inpatient substance abuse program at the Stonington Institute.
When the child was committed to the department on January 24, 2001, the stated goal was reunification of Lucas with his mother by the end of March with ever-increasing supervised visitation. On March 28, 2001, the court (Mack, J.) approved parental reunification as the permanency plan — although mother was relapsing. father was reported to have been "doing better and complying." As noted. however, four months subsequent to this approval, Judge Mack approved the termination and adoption plan. The department filed the present petition a few months later.
 C. Conditions, Steps and Court Orders
The court has conducted an analysis of the testimony and exhibits relevant to father's relationship with the department, the service providers and the court during the pendency of this case from an historical perspective. What follows is a chronological account of those relationships as the same may impact on the ultimate issues in this case. i.e., the efforts made by the department to reunify Lucas with father and the efforts made by father to rehabilitate so as to be able to resume a constructive role in his child's life within a reasonable time.
1. Prior to The Initial Order of Temporary Custody
Relevant and material to the court's analysis is the information provided in Court Exhibit 2 that documents an evaluation of father conducted by United Services on December 12, 1996, and offers great insight as to father's personality and behaviors. Father was ordered by the criminal court to undergo the evaluation due to pending breach of peace and threatening charges stemming from a domestic violence incident (apparently with mother)[5] in which, he admitted, he "figuratively" threatened to kill the victim. Father admitted to two previous domestic violence incidents, one with mother, one with a previous girlfriend. The court-commissioned evaluator noted alcohol on father's breath and suspected substance abuse which father denied. Father was confident that one counseling session would be sufficient to satisfy the court as he worked many hours.
2. From Lucas' Birth to Adjudication
CT Page 15334-ds
As noted, the department commenced its involvement two days after Lucas' birth due to confirmed drug use by mother. While the department was involved, the altercation at father's office took place, father refused to be evaluated for substance abuse, mother continued using drugs and Lucas missed two scheduled appointments with his pediatrician. As a result, the first order of temporary custody was issued and a court found that child was in immediate physical danger and ordered steps for the respondents to follow. Father's steps mandated, inter alia, that he obtain parenting and individual counseling in addition to substance abuse testing, evaluation and. if recommended. treatment. In December, 1999, father did undergo an evaluation at United Services and one counseling session. The department's involvement ended on December 20, 1999, when the child was found neglected and the guardianship disposition was ordered.
3. The Period of Protective Supervision
When protective supervision was ordered on April 19, 2000, the court again issued specific steps to father. Significant among those steps were the court's orders directing father to engage in individual counseling to address anger and domestic violence and to access the substance abuse programs offered by United Services in Columbia. Father was also ordered to submit to such random drug testing as the department may direct, to cooperate with the department and to follow the recommendations of the service providers. The department was ordered to provide the referenced services and to monitor father's progress. Within weeks of signing the court-ordered conditions, father refused to undergo a hair test, refused the "ABH"[6] evaluation necessary for the implementation of services, refused to engage in any anger management or domestic violence counseling and stormed out of the department's office. Father's excuse for his refusal was that he was too busy and had no time. Father continued to deny that he was abusing substances and claimed that his use of illegal substances was "recreational" only. (See Respondent's Exhibit T and Child's Exhibit 3.) On May 16, 2000, the day before he was ordered by the court to submit to three urine tests per week, father did visit United Services in Columbia to arrange for substance abuse testing and treatment, however he refused to commit to the recommended program due to his additional employment as a construction worker in Boston. In apparent recognition of father's difficulties, United Services requested its Dayville office to take over the case. That situs was more convenient for father as it was next to father's office. In early June, 2000, father met with the clinician in the Dayville office who testified that the goal was to monitor father's testing and to meet with father in a therapeutic setting to address his substance abuse. Aside from one additional brief CT Page 15334-dt and rushed urinalysis encounter, father failed to make himself available to or establish effective communication with the clinician, and thus missed a number of appointments.
The clinician, frustrated over father's inability to provide random or scheduled urines. asked the department to request a hair toxicology test which was ordered by Judge Mack on June 14, 2000, to be done "immediately." The test was scheduled for 9:00 a.m. on June 16, 2000, after some negotiating of the time with father. Although father appeared at the appointed time and place, he had just gotten a haircut, which left him with less than the one and one-half inches of hair required for the test. Although the department asserted that father purposely "shaved his head" to avoid the court-ordered hair test, father countered that he had his hair cut for a job interview. In light of father's attitude and behaviors as described thus far and given father's level of intelligence and education. this court finds that the job interview was but a convenient excuse for father's flagrant violation of the court order. This court further finds that father's motivation for the haircut was his continued oppositionality and defiance. In considering the evidence introduced in a case. [triers of fact] are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life, but, on the contrary, to apply them to the facts in hand, to the end that their action may be intelligent and their conclusions correct." (Citations omitted, internal quotation marks omitted) In re Carissak, 55 Conn. App. 768, 783 (1999)
On July 5, 2000, father appeared before Judge Mack and, in light of the hair test fiasco, offered to do urine tests five days a week which were then ordered by the court. However, on July 27, 2000, the organization responsible for the testing (SCADD) discontinued its service to father for non-compliance. One week thereafter, United Services (Dayville) formally terminated its involvement with father for the same reason. Shortly thereafter, the second order of temporary custody was issued which effectively terminated protective supervision. As noted, due to father's lack of cooperation and mother's positive hair test, a third order of temporary custody was entered on August 8, 2000. As also noted earlier herein, that order was vacated on August 18, 2000, on the condition that father and mother live separately and that both parties cooperate with the department and service providers and remain drug free. Mother failed the hair test one week later, resulting in the third and final order of temporary custody. Lucas was placed, for a third time, this time with a foster family with whom he continues to reside.
It is noteworthy that during the nearly four month period of protective CT Page 15334-du supervision, father had four different jobs in addition to his professional practice, including the construction job in Boston and three auto sales positions in Connecticut, all of which, father claims, he lost due to his testing obligations. His employment responsibilities, however, were chief among the reasons father gave for his failure to adhere to the testing requirements. Noteworthy also is the fact that during the five month period from April through August, 2000, father did provide urine samples on thirty-one occasions all of which were negative or illegal drugs. On August 17, 2000, however, father exhibited a blood alcohol level of .021. He operated his motor vehicle mid-day to and from the test site while legally intoxicated.
4. From the Order of Temporary Custody to Commitment
Within one week of his child being removed from parental care for a third time, father informed the department caseworker that he could not comply with the urinalysis schedule because he was starting yet another job. One week thereafter, father informed said worker that he was "too busy" to engage in the court-ordered domestic violence and anger management counseling.
In mid October, 2000, however, after announcing to the worker his intention to enroll in an accredited substance abuse inpatient program at Connecticut Valley Hospital or at Milestone, father, without participation by the department, enrolled in a residential holistic program at Mountainside in Canaan where he remained for the full two-week period. Father admitted during his testimony that the period immediately preceding his admission to Mountainside was "the height of his drug use" as he "lost it" when Lucas was removed for the third time. As a result, father suffered significant relapse and estrangement from his family. Father testified that Mountainside, with its spiritual approach and twelve step program, "cleared his head and slowed him down." Mr. Jutras, the department caseworker pointed out during his testimony that the facility is not accredited and is not licensed for substance abuse treatment. Father admitted smoking marijuana while at Mountainside.
Once father's stay at Mountainside was over, the department, on October 25, 2000, referred father to New Perceptions. Father participated in an initial evaluation on November 15, 2000, and commenced a weekly group and monthly individual substance abuse therapeutic program on December 4, 2000. Father remained in this program until July 26, 2001. The intake documents (Petitioner's Exhibit 5A) noted that father was motivated to remain drug free and to regain custody of Lucas. The documents also note father's desire not to resume a relationship with mother "because of her drug use" problem, The treatment summary indicates that father did well CT Page 15334-dv from December through April, 2001, however he relapsed in May and again in July, at which time he declined a recommendation that he pursue a higher level of care. Father was, therefore, discharged in July for refusing the referral and for using marijuana and cocaine. On discharge, father stated that he would "stay clean" on his own. The therapist noted that the prognosis for recovery from his addiction was not a good one, and that unless more intensive substance abuse treatment is provided there was "no doubt" that father would continue to abuse substances. After admittedly using cocaine steadily for over twenty years, it was observed that father gained little insight as to the effect of that substance on all aspects of his life.
The New Perspectives' therapist also noted that unless father addressed his mental health (personality and behavioral traits) issues, he would continue to abuse substances. On three separate occasions during father's participation in this program, his therapist scheduled appointments for a psychiatric evaluation, for treatment purposes, none of which were kept by father, nor did father have the courtesy to call to cancel. Father's therapist testified that, although he missed two out of six individual sessions, father missed only one group session. Father was cooperative in group therapy and made "moderate" progress. However, during father's participation in the program, he faced many stressors including financial difficulties, health problems (stomach, pneumonia, insomnia), the death of a close friend and a fourteen day incarceration. Father acknowledged that the program was helpful and admitted his failure to cooperate relative to the recommended mental health evaluation. Father gave as the reasons for failing these separate appointments, the cost of the process and the pending court-ordered forensic evaluation by Dr. Krulee.[7] On January 24, 2001, Lucas was committed.
5. From Commitment to the Termination Petition
At the commitment hearing, specific steps were issued to father pursuant to § 46b-129 (j) which were similar to the protective supervision conditions, again, ordering individual and substance abuse counseling and cooperation with the department and service providers. The stated goal was reunification of Lucas with mother. Supervised therapeutic visitation was ordered for both parents which took place weekly at department offices or a public park from February to August, 2001. The services were terminated following a violent confrontation between the respondents resulting in father's arrest and a "no contact" protective order. The visitation supervisor testified that it was her function to not only view and record the event, but to constructively critique parental interaction with the child. Although father attended most of the visits, on at least half of those visits, father did not stay CT Page 15334-dw for the instructional session, explaining that he had "other things to do."
The supervisor reported in her visitation log (Respondent's Exhibit U) on March 13, 2001, that father did not make that visit, did not call to cancel or reschedule and that she "didn't know where he was." Jutras reported that he offered father supervised home visits with the child during the following week. Father responded that his work schedule would not allow time for such a visit and that he might be able to make it the following week. One week after that conversation, father's hair test was positive for marijuana and cocaine. Thirty days thereafter, urinalysis confirmed continued use of those substances by father. (Petitioner's Exhibit 5A). The visitation log reveals that during July, 2001, father missed two consecutive visits due to a planned vacation in Cape Cod, during which, father admitted, he again abused cocaine and marijuana. The supervisor noted that father and Lucas enjoyed the visits. She testified that the child was "happy coming and going" and that for Lucas, it was "playtime." During the May 23, 2001 visit, she noted that the interaction between the two was "more positive than in the past." The supervisor observed approximately twenty visits between Lucas and his father.
The respondents' continuing substance abuse and the reoccurrence of domestic violence prompted the court on August 8, 2001, to approve termination/adoption in lieu of reunification as the permanency plan and to find that the department did not have to make any further efforts to reunify. Two months later father did connect with a more intensive substance abuse program known as "Quinebaug" administered through Day-Kimball Hospital. Father was, however, unsuccessfully discharged on November 19, 2001, due to his absenteeism and failure to follow the program rules. The program required his attendance five days a week from 8:15 a.m. to 1:30 p. m. for seven weeks. During the sixth week father had an argument with staff over the rules, became enraged and left the program. Father had arranged for state-funded "SAGA"[8] benefits to handle the cost. At that time father worked full-time as a security guard at Foxwoods and saw his patients on Saturday and Sunday. Foxwoods was the seventh job, in addition to his practice, that father held since department involvement. He left that employment in January 31, 2002. Ten days after father's unsuccessful experience at Quinebaug, the department filed the termination petition.
6. From Termination Petition to Trial
On December 12, 2001, father, of his own volition, committed to another intensive outpatient substance abuse program known as Sachem House. On January 11, 2002, father successfully completed that program which CT Page 15334-dx required his attendance five days a week from 8:15 a.m. to 1:30 p.m. The discharge summary (Petitioner's Exhibit 21) indicated that on discharge father was working and was going to AA meetings. The prognosis was "fair" and New Perceptions was, again, recommended to him for aftercare as to substance abuse and mental health issues. Noteworthy is the fact that father was under the supervision of a clinical social worker and an attending psychiatrist who prescribed no medication. Treatment records contain an admission from father of marijuana use two weeks prior to admission and cocaine use one week prior thereto. Thus, father used marijuana within a week of his discharge from the previous intensive program. When asked if drugs were a problem, father responded "considerably." When asked if alcohol was a problem, father's response was "not at all." Father disclosed that his "longest period of abstimence" was one month. At trial father explained that he was referring to alcohol, however, he readily admitted to a better than twenty year use of cocaine and a fifteen year use of marijuana. Father testified that, since Lucas' birth, his longest interval without using cocaine was seven months.
Father's therapist at Sachem House, a licensed clinical social worker with twenty-two years experience in the field, testified that father's attendance was excellent, he was never tardy and was open and focused in group discussions. All testing produced negative results. The therapist's prognosis, however, at discharge was "fair."
On January 16, 2002, the court-approved permanency plan was re-approved without objection and the no further efforts finding was reconfirmed, however, despite that finding, Jutras referred father to an OIC domestic violence program in New London. Six days later, on February 8, 2002, father attended an intake appointment at New Perceptions in Willimantic. Father, however, did not seriously commit to the therapy until three months after the intake evaluation. The only impetus for father's enrollment in the domestic violence program, two months after the department referral, was a criminal court sentence. The court will hereinafter address father's criminal conduct both before and after his involvement with the department.
Due to father's extensive history of abuse and his previous contacts with New Perceptions, he was accepted into the program and was recommended for an outpatient group substance abuse aftercare program. Treatment records from Willimantic indicate that father was "uncooperative and clearly prioritizing his employment." (Petitioner's Exhibit 5b.) With the assistance of the department, a random urine protocol was agreed to in lieu of the therapeutic program. Father complied for three weeks and then terminated the process indicating that he would CT Page 15334-dy be unable to further comply due to his schedule. It was then suggested, once again, for father's convenience, that the Danielson office be contacted for services.
On May 2, 2002, after father was arrested for drunken driving, after father had enrolled in the court sanctioned domestic violence program and after father had, by his own admission, relapsed on both cocaine and marijuana, father met with the Danielson therapist.
At the first meeting with said therapist, father agreed to commit to urine testing three times per week — one at the weekly group session, one midweek and one at the office of his probation officer. Father admitted to the therapist his most recent relapse and correctly predicted the positive results of the first urinalysis. The therapist testified that the level of cocaine use indicated was "concerning" however, she opined that "any cocaine is too much." Father told the therapist that he needed to be there for himself and his son, promised to commit to the program, and pledged "no more dirty urines." She testified that from May 2, 2002 to August 12, 2002 (the first day of trial), father attended nine of the weekly one hour evening group sessions, which amounted to a sixty percent attendance rate, and reported his participation as "semi-active." She stated that while father appears motivated and has the skills and ability to recover, she remains concerned given father's significant history of cocaine use, that he "lacks critical insight" as to the adverse impact that his drug and alcohol abuse had on all facets of his life. Given those concerns, the therapist pronounced his prognosis as "fair." His prognosis remained fair despite father having become more active in group, receiving psychotherapy and taking mood stabilizing medications — all of which took place after the commencement of trial and which will hereinafter be addressed.
7. Father's Criminal Involvement
The court has, up to this point, made some reference to father's criminal behavior in detailing the history since department involvement in his life and that of his child. Father's criminal history offers further insight into his overall attitudes and behaviors as the same may affect his prospect for rehabilitation.
A review of father's criminal record (Petitioner's Exhibit 15) reveals seven convictions from 1995 to April, 2002, including two convictions for disorderly conduct (1995 and 1997), two for breach of peace (1996 and 1997) and a possession of marijuana charge for which he was fined. CT Page 15334-ez
While this case has been pending, father has been arrested on three occasions and convicted twice; the third matter is still pending. On March 22, 2000, father was arrested and charged with threatening. He failed to appear in court to answer the charge on May 29, 2000, resulting in a finding of guilty on both charges and a concurrent sentence of one year after fourteen days. Which father served, followed by one year probation.
On September 1, 2001, an incident occurred at father's house between the respondents which also involved a friend of mother. Mother alleged that she was assaulted by father. Mother's friend alleged that father damaged her car. When the investigating officer, Trooper Zmayetski, arrived, he observed that mother was holding her stomach, crying and scared and that the girlfriend's windshield was cracked, rear-view mirror broken and door sprung. Mother was transported to a hospital by ambulance where she received emergency care. Zmayetski testified that when he spoke to father about the incident, father exhibited "a cocky attitude as if he were untouchable" and denied any wrongdoing. The trooper also testified that after the incident, father pressured mother to recant. On November 2, 2001, father was arrested and charged with assault in the third degree, criminal mischief in the second degree and breach of peace. Father reached a plea agreement, pleaded to and was convicted of the criminal mischief and breach of peace charges. On February 25, 2002, he received, on each count, a sentence of six months, suspended with eighteen months probation, the sentences to run consecutively.[9]
On April 15, 2002, father was arrested for operating his motor vehicle while intoxicated. The Breathalyzer test revealed blood alcohol levels of .136 and .129. The arresting trooper testified that father exhibited the attitude of "a know it all." That charge is currently pending, although there was mention of father's participation in an alcohol education program.
Gregory Waring, father's probation officer testified that in April, 2002, he referred father to the court-sanctioned domestic violence program and in May, 2002 to New Perceptions in Danielson. Completion of those programs then became conditions of the successful completion of father's probation. Waring testified that father tested positive for marijuana on June 14 and June 28, 2002. Father denied using but admitted that he was in a car with fiends who smoked marijuana. Waring opined that even if father's explanation is true, such was irresponsible to himself his child and the goals of his probation. Waring did not seek a violation warrant as father was engaged in treatment, attending the domestic violence program and was cooperative with the officer. As of August 14, 2002, father had complied eighty percent of the time with a three times CT Page 15334-ea per week urinalysis schedule. Waring also stated that one of the conditions of father's probation was full compliance with a "no contact" protective order relative to mother. Waring indicated that as of July 18, 2002, the coordinator of the domestic violence program reported that, after three months in the program, there was "a lot of work to be done."
James Harmon, the coordinator of that New London program known as "Stopping Domestic Violence," testified that the intensive psycho-sexual educational program is a twenty-six week program consisting of weekly sessions lasting one and one-half hours. Program records indicate that after four sessions, father felt he did not need the program as the crime was not serious. The facilitators noted that father minimized his abusive behaviors. Father had claimed that he was "clean" for two months; he did not disclose his recent use of cocaine and marijuana to the facilitators. After twelve sessions, it was reported that father was beginning to take some responsibility for his unsound choices. After fifteen sessions progress was noted as father was beginning to accept the consequences of his inappropriate behaviors. Harmon stated that, as of September 18, 2002 (five months into the program), father missed only two classes. Participants are allowed to miss a maximum of four. He testified that in the classes father has voiced responsibility for past behaviors. He added that father knows "this is his last chance." Harmon, however, was not aware of the positive tests in June, 2002 and recalled that father disclosed at the time that he had a beer. Harmon reminded the court that termination from the program usually results in an arrest and prosecution for violation of probation.
 D. Professional Evaluations
1. Dr. David Mantell
On August 10, 2000 (two days after the issuance of the second order of temporary custody), Mantell, a clinical and forensic psychologist, conducted the first of two court-ordered psychological evaluations of father. The evaluation also included mother and an observation of each parent with Lucas.
Mother did disclose that, at the time of the evaluation, she was age 24 and father was age 38; that the respondents had resided together for three and one-half years and that Lucas had resided with his parents for a total often months. Mother denied any domestic violence and denied using any drugs with father. Mother claimed that her cravings for cocaine were gone and asserted she had not used the substance since April, 2000.[10]
CT Page 15334-eb
During his initial interview with father, Mantell observed that father was cooperative, but "hyperkinetic." Father volunteered that he had spent seven years and $250,000 in the sport of high-powered motorcycle racing and was the national champion in his division. He achieved this during the three year relationship with mother. He told the examiner that he had "too many good points to list." He denied that he had any substance abuse problem although he admitted to "smoking weed occasionally" and he admitted that he combined the marijuana with cocaine "a few times." Self-psychological testing, however, revealed clinical levels of drug and alcohol use. As to the alleged assault of mother, as claimed by the paternal grandmother, father referred to the incident as "a pushing match" and asserted that Lucas was never in danger. Father disclosed to Mantell that his criminal convictions resulted from three incidents with two prior girlfriends and two incidents with mother. Additional testing indicated father experienced anger management difficulties at a clinical level.
After further discussion and evaluation, father conceded that, although he might be addicted to marijuana, it was mother who was addicted to cocaine. Father stated that the only times that he experienced cocaine use was when mother was using. Father viewed the department's action in removing Lucas from his care as "unforgiving," noting the "embarrassment" that resulted from his neighbors' knowledge of the action.
In addition to marijuana and cocaine abuse (needing to rule out dependence), Mantell diagnosed that father exhibited an adult relationship disorder and a personality disorder with narcissistic and antisocial traits. Bi-polar disorder was suspected.
During their interactions with Lucas, Mantell observed that the child was responsive to and affectionate with both parents. He opined that mother and father were the psychological parents to Lucas and that the child looked healthy. Mantell concluded that each of the respondents was addicted to drugs and that the habit of one influenced the habit of the other. He observed what he felt was a positive relationship between the respondents, and between them and the child, although he reported that "father's materials indicate less than a satisfactory attachment to the child." He cautioned that the adult relationship was unstable due to the addictions and personality conflicts. Mantell concluded:
 Both parents are seen as having emotional, behavioral, substance abuse, and personalty problems that impair their ability to get along with one another and to satisfactorily discharge child care responsibility. CT Page 15334-ec
 It is recommended that the child be left in the care of the parents only under Protective Service Supervision and if the parents are compliant with the following conditions.
a. They remain drug free.
 b. They enroll in substance abuse and relapse preventions programs.
 c. The father receive a psychiatric evaluation to rule out Bipolar Disorder.
 d. The parents engage in anger management programming.
 e. The parents then engage in a relationship treatment that will incorporate the skills developed in other treatments to improve their relationship and their parenting capacities.
(Petitioner's Exhibit 3.)
Eighteen months after the initial evaluation, Mantell again evaluated each of the respondents and observed them with Lucas. Some discussion of Mantell's findings during his evaluation of mother on February 13, 2002, is appropriate and is relevant and material to father's issues.[11]
Mother disclosed to Mantell that she never used cocaine until she met father and that father, in fact, introduced her to the addictive substance. Mother disclosed that with his increased use of cocaine, father's verbal abuse soon escalated to physical abuse and that she sustained bruises and broken ribs from that abuse. Mother stated their relationship ended as a result of the September, 2001 incident earlier described. As to that relationship, Mantell observed that mother "came under the influence of a successful, hard driving, fast living, substance abusing man who seems to have seriously undermined her integrity and her transition into adulthood." Assuming that mother was able to achieve success over her addiction, Mantell recommended that the court consider placement of Lucas with his mother "because of her superior parental competence and greater strength of the mother and son bond." (Petitioner's Exhibit 4.)
In his report of his second evaluation of father, performed on the same CT Page 15334-ed day as that of mother, Mantell details father's history with the department, service providers and police since their first meeting — all of which has been related earlier herein. Although father admitted continued use of cocaine, he boasted that recent use was "very little compared to what t used before." Father also admitted to the use of marijuana, however he assured Mantell that the illegal substances were "rarely used" when he had Lucas and "never" when the child was in the house. Father denied that his environment was unsafe for Lucas. Father asserted that his goal was to get custody of his son, irrespective of mother's involvement, and to worry about his (father's) own recovery. He promised Mantell that he would continue whatever testing and counseling the department would recommend "as long as they want."
Mantells final diagnosis was "severe poly substance abuse" and "hypo-manic, self-defeating and anti-social personality features." Mantell recommended that father engage in ongoing substance abuse treatment and individual counseling in order to gain an understanding of his personality traits and parental weaknesses. Mantell cautioned that neither parent should be considered as a placement source for Lucas until he or she achieves "one year of sustained sobriety." Emphasis added. (Petitioner's Exhibit 4.)
2. Dr. David Krulee
Krulee, a practicing forensic psychiatrist, performed a psychiatric evaluation of father on January 17, 2001, which was ordered by the court on December 11, 2000. Father admitted that his primary problem was substance abuse and asserted, without being asked, that he was never depressed or suicidal: received no prior psychiatric treatment and did not experience a bad childhood. Father described himself to the evaluator as a "rare breed" and made several other references to his special and unique qualities. Father denied any current drug use and asserted that he was clean for three months. Father told Krulee that parental reunification with Lucas had been delayed pending the psychiatric evaluation and described the process as "a lot of bureaucratic red tape."
Father disclosed that at its peak, the respondents' use of cocaine cost them $300 per week and that the chosen mode of use for both was internasally. According to Krulee's report (Child's Exhibit 4) father was "dismissive" as to alleged problems with his mood. Father categorized his five arrests for domestic disputes with three different women as "all verbal stuff."
Krulee concluded that a bi-polar disorder was an unlikely diagnosis for CT Page 15334-ee father. The psychiatrist noted that father exhibited a variety of narcissistic features, assigning his needs a priority over those of others. Krulee detected "a sense of entitlement and subtle arrogance." He agreed with Mantell's diagnosis of cocaine and marijuana abuse, however, Krulee elevated the abuse to a "dependence." He diagnosed a personality disorder (not otherwise specified) with narcissistic, impulsive and antisocial features and thereby confirmed both of the personality traits found by Mantell. Krulee concluded as to father:
 There is also a significant thrill seeking, impulsive and hyperactive aspect to his personality which as been present since at least adolescence. He becomes bored easily as evidenced by his frequent changes of romantic partners and careers. He gravitates towards thrill oriented leisure activities to include motorcycle racing, spending a lot of money, and drugs.
(Child's Exhibit 4.)
Krulee, as an evaluating forensic psychiatrist, made no recommendations for psychiatric treatment or psychotrophic medications.
3. Dr. Willie Coleman
One month prior to the commencement of trial, father requested that Coleman perform a psychological evaluation of father. Coleman has been a licensed clinical psychologist for fifteen years and is the clinical director of the Care Center in New London. He evaluated father on three dates in July, 2002. Father disclosed to the evaluator continuous marijuana use for twenty-five years and continuous cocaine use for nineteen years. Father admitted to a cocaine relapse every six to eight months and acknowledged that until recently, he never was committed to being clean and sober. Father stated that the motivation for that recent commitment to his substance abuse problem was his arrest for drunken driving. Father claimed that he had not used drugs for six and one-half months from November 2001 to May 2002.
Coleman agreed with the diagnoses made by Mantell and Krulee. Coleman opined, however, that emphasis should have been given to both father's substance abuse issues and his personality issues as father's "personality problems interfered significantly with his adequately addressing his substance abuse and with his conforming to DCF mandates." (Respondlent's Exhibit BB.) Father did not disclose to Coleman the three failed attempts by father's New Perceptions therapist to schedule a CT Page 15334-ef psychiatric evaluation with a treating psychiatrist between December 2000 and March, 2001.
4. Dr. Ruben Spitz
Spitz has been a licensed clinical psychologist since 1999, and has clinical offices in North Stonington and Waterford. After the Coleman evaluation, father sought a second opinion and was evaluated by Spitz on August 7, 2002 — five days prior to the commencement of trial. In preparing for the two hour interview with father, at which no psychological tests were administered, Spitz reviewed the department social studies (Petitioner's Exhibits 1 and 2), Mantell and Krulee's evaluations and a fourteen page narrative prepared by father. Spitz reported that his conclusions were based on the personal interview and the aforementioned documents only, each of which were submitted by father and his attorney. Father admitted that the respondents maintained a lifestyle which included domestic violence, drug and alcohol abuse and financial and social irresponsibility. (Respondent's Exhibit EE.) Spitz's notes indicated that father stated that he was never without drugs for more than six months in the past twenty years.
From his review of the records submitted by father, Spitz noted the many attempts to provide rehabilitative services to father and his many rebuffs relative thereto, including his failure to attend psychiatric appointments. Spitz observed that father's oppositionality applied to all interventions whether the same consisted of group therapy, drug screening or court orders.
In his report, Spitz confirmed that father's drug and alcohol abuse "remains unresolved" and that father's" pattern of impulse discontrol [and] hypomanic/hyperactive behaviors — has yet to be clinically isolated — or appropriately treated." In addition to cocaine dependency, Spitz diagnosed a narcissistic and antisocial personality disorder. He testified that such could be referred to as a "dual diagnosis," however, he does not employ that term in his practice. Spitz recommended, iter alia, that father engage in long term psychotherapy with a qualified therapist who need not be a clinical psychologist. Spitz opined that, to date, no adequate therapeutic relationship had been established. As earlier described herein, father did have a clinical relationship with the New Perceptions therapist from December, 2000, through May, 2001, during which time three separate psychiatric referrals were made and rejected. Father has had an on-going clinical relationship with his current New Perceptions therapist since May, 2002.
Spitz agreed with Coleman that both aspects of father's diagnoses CT Page 15334-eg needed to be addressed, however this evaluator testified that initially the need was "to control dysfunctional behaviors in order to deal with the personality issues." He recommended what he referred to as "a cognital behavior approach" and, in fact, started to clinically treat father on August 19, 2002 (after the forth day of trial), and, as of September 24, 2002, has conducted five treatment sessions with father. Spitz referred father to father's general practitioner who prescribed Depakote for father's manic symptoms. Spitz stated that father is now calmer, more focused and more resolute; he is committed to both his mental health and drug therapies and to doing whatever he needs to do to provide a suitable environment for his son. If committed to all current interventions, Spitz opined, father's prognosis is "good. In his report, Spitz added the following qualification:
 It is beyond the scope of this report to comment on the psychological needs or current developmental stage of Lucas. Emphasis supplied.
(Respondent's Exhibit EE.)
IV. ADJUDICATION
For the purposes of adjudication, the court is limited to a consideration of those events which preceded the filing of the termination petition. Practice Book § 33-3(a). The adjudication date is therefore November 29, 2001. The disposition date is the date that the trial concluded and the decision was reserved.[12] The court will consider the last day of trial. September 24, 2002, as the disposition date.
 A. Reasonable Efforts
Prior to considering whether the statutory grounds that the petitioner alleged provide the basis for the termination of father's parental rights and prior to considering whether such termination is in the best interest of Lucas, this court must consider the "reasonable efforts" findings required by § 17a-112 (j) (1). That section provides that in order for the court to grant the termination petition, it must find b clear and convincing evidence that the department has made reasonable efforts to locate the parents and to reunify the child with the parents. In lieu of that finding the court may find, by clear and convincing evidence, that the parents are unable or unwilling to benefit from reunification efforts.
1. Previous Court Findings
CT Page 15334-eh
The cited section also states "provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of Section 17a-110 . . . that such efforts are not appropriate." The cited subsection refers to a determination by a court as to the appropriateness of continuing efforts "at a hearing held in accordance with subsection (k) of section 46b-129."
As noted previously, the court (Mack, J.) on two occasions found that further efforts by the department to reunify Lucas with his parents were no longer appropriate. The first such finding was made on August 8, 2001, at which time § 46b-129 (k) (2) made no provision as to the quantum of evidence required for the court to make such finding. All that was required, as of that date was a hearing at which the court is obligated to consider the child's best interests and need for permanency. After hearing from counsel for each of the parties, the court made such finding.
The second such finding, that further efforts by the department to reunify were no longer appropriate, was made on January 16, 2002, after the termination petition was filed and after the effective date of Public Act 01-142, Section 7 which amended § 46b-129 (k) (2) to provide that in order for the department to cease making efforts to achieve parental reunification, the court must find that such further efforts would be inappropriate "upon clear and convincing evidence" at a permanency hearing. As noted, both respondents were present at that hearing and were represented by counsel and neither of their attorney's voiced an objection to the "no further efforts" finding requested by the petitioner. A review of a transcript of that hearing, however, confirms that on the record the court did not make the finding by clear and convincing evidence, although an order was signed by the court subsequent to the hearing in which such finding was made by "clear and convincing evidence."
In its argument, the petitioner asserted that it had proven by clear and convincing evidence all three of the statutory alternatives, including the previous findings by the court, that would preclude this court's inquiry into the other two statutory alternatives. Given the importance of this issue to the determination to be made in this case and given the significance of the aforementioned changes to the statutory standard of proof made after the first finding but before the second finding, this court will hold the petitioner to its statutory obligations and will determine whether the petitioner has proven by clear and convincing evidence, introduced during the trial, that the department has made reasonable efforts to reunify Lucas with father or that father is CT Page 15334-ei unable or unwilling to benefit from reunification efforts.
In the termination petition, the department alleges that it has made reasonable efforts to reunify Lucas with the respondents, but the respondents are unable or unwilling to benefit from such efforts. The Appellate Court has referred to the word "reasonable" in this statutory context as the "linchpin" in adjudging the efforts by the department under the circumstances of the particular case. In re Ebony H.,68 Conn. App. 342, 349 (2002). The court has stated that the department's obligation hereunder is to do everything reasonable and that the department is not expected to do everything possible. Id. Reasonableness is an objective standard and the issue of whether the efforts made by the department were reasonable depends upon the court's consideration of all of the circumstances in this case. Id.
As part of its obligation to employ reasonable efforts in attempting to reunify' children with their parents, the department is required to take a parent's mental condition into consideration in determining as to what reasonable efforts should be made in a particular case. In re Antony B.,54 Conn. App. 463, 475 (1999). Attempts by the department to provide services to a parent are sufficient to satisfy the statutory mandate where the parent fails to complete the programs that are offered. In reSteven N., 57 Conn. App. 629, 635 (2000).
As to mother, the department referred her to both inpatient and outpatient drug treatment programs, however, she was unable to maintain a drug free life style despite these significant interventions. With the department's assistance, mother received outpatient testing, evaluation and treatment services through United Services from November, 1999, until August, 2000, and, again from October, 2000 to July, 2001. She participated in a two week inpatient program at Stonington Institute in October, 2000. She received, through the department's efforts, the TEEG therapeutic visitation services. The department also paid for Mantell's evaluations. Mother continued to use drugs after Lucas was committed to the department despite the stated plan of reunification with mother and up to a point in March, 2001 when reunification was nearly attained. As to mother, this court finds that timely extensive and appropriate efforts were made by the department to achieve reunification with Lucas, however, mother was unable to benefit from the services resulting from those efforts.
As to father, the department has provided or arranged for the following services: two psychological evaluations; a psychiatric evaluation, supervised and therapeutic visitation; substance abuse evaluations, testing and treatment; therapeutic and psychiatric services and case CT Page 15334-ej management services. The department also provided appropriate placement, educational and treatment services for Lucas. In the delivery of these various services to father, and throughout its involvement in this case, the department has been persistent, diligent and professional in spite of father's lack of cooperation, oppositionality, threats and angry outbursts.
This court has earlier described father's dismal record of performance as to the court-ordered urinalysis testing from April through August, 2000, including the hair test fiasco, father's relationship with the two United Services facilities and his many changes of employment. Michael Early, the department caseworker during that time period, testified that father refused to stay connected with any service provider to which the department referred him. Early further stated that unless father complied with the court-ordered testing, appropriate substance abuse and mental health providers could not commence father's treatment.
Jutras, who has been the caseworker since August, 2000, testified that between September, 2000 and November, 2001, he made six referrals, including two to SCADD, three to New Perceptions and the referral to the Quinebaug program at Day-Kimball in October, 2001. As also noted, during the period from December, 2000, to March, 2001, New Perceptions made three separate referrals for father to undergo psychiatric evaluation and treatment. Until the termination petition was filed in November, 2001, father did not complete any of the drug treatment programs to which he was referred by the department: Mountainside was father's own idea in October, 2000, as was father's participation in the Sachem House program in December, 2001.
Despite the first "no further efforts" finding by the court in August, 2001, Jutras persisted in his efforts to provide appropriate services to father. In January, 2002 he assisted in arranging for aftercare through New Perceptions and in February, 2002, he referred father to the OIC domestic violence program in New London. As earlier herein stated, however, father did not establish a serious connection with New Perceptions or with the domestic violence program until months later and after he had been charged with drunken driving and had relapsed. Jutras testified that father was constantly "throwing curves" and placing obstacles in the way, thereby frustrating the department's attempts to connect father with service providers or to maintain any connections made. Father consistently denied that he needed treatment and claimed that he could not afford treatment. Instead of assigning the cessation of his substance abuse as a priority in his life, father made the retention of his mortgages on two homes as that priority and so stated to Jutras. When father did decide to engage in services (Mountainside, Sachem CT Page 15334-ek House, Dr. Spitz) the department was the last to know.
During his testimony, father conceded the many attempts by the department to deliver services to him. Father explained that Jutras would make the referrals which would then require father to make the calls, sign the releases and attend the appointments. Father acknowledged he made "bad decisions" in failing to comply with the court-ordered steps and testing and in assigning money, his practice, jobs and his homes as priorities. Father admitted that he terminated all of his health insurance coverage in an ill-conceived, anger-motivated reaction to the third order of temporary custody. Father does not dispute the efforts made by the department to deal with his drug abuse, anger and relationship problems. The evidence is clear and convincing that the department made, not only reasonable, but substantial efforts in that regard.
3. The Mental Health Issue
Father, however, while acknowledging the department's aforementioned efforts, asserts that such efforts were not enough and, therefore, were not "reasonable" as that term is utilized in the statute and interpreted by the courts. Father agues that the department's efforts should have been directed toward his personality traits or disorders in addition to his substance abuse and relationship issues. He correctly points out that all four of the evaluating professionals agreed that father's narcissism, impulsivity and antisocial behaviors all were at clinical levels. Father argues that the department was aware of his mental health needs via the court-ordered evaluations yet failed to make reasonable efforts to appropriately address those needs simultaneously with his drug abuse and relationship issues. He refers to the testimony of Coleman and Spitz, both of whom concluded that insufficient services were offered by the department in this regard and that father's mental health needs were largely ignored by the department. Coleman testified that the substance abuse and personality issues should have been treated simultaneously and that to concentrate on the former without, at the same time, addressing the latter, was an outmoded and outdated therapeutic approach. Spitz concluded in his report that "it does not appear that all reasonable resources/interventions available in regards to mental health services have been utilized."
A simple answer to father's protestations would be to find, as is amply supported by the evidence, that, insofar as services are concerned, what was offered by the department was not accepted by father. In this case, however, the simple answer will not suffice. The court, therefore, will analyze the evidence from the mental health perspective. CT Page 15334-el
It should be mentioned that the stated goals for father reflected in the court-ordered steps of April 19, 2000, were to direct services toward the substance abuse and domestic violence issues. Nearly one year later, those goals were reconfirmed by the court-ordered steps dated January 24, 2001, at which time the goal of parenting training through TEEG was added. On both occasions, father was ordered to follow the recommendations of service providers and to keep all appointments set by the department. As has been made abundantly clear by the evidence, father failed to follow through with many recommendations made by clinicians and failed to attend many therapeutic appointments arranged by the department. In addition, on numerous occasions, father flatly refused to access therapeutic programs and refused to even consider therapeutically addressing his history of violent romantic relationships. In September 2000, father stated he was "too busy" and again refused to address those issues. Father's refusal on three occasions to keep appointments set by the New Perceptions therapist as she attempted to connect him with a treating psychiatrist to address his personality disorders, while his substance abuse issues were being addressed, is the most flagrant example of father's obstinate refusals to accept services offered by the department and its contracted providers. While father was actively engaged in the program at Sachem House in December, 2001, his treatment was being monitored by a psychiatrist. Krulee's report of his forensic evaluation of father contains no recommendation for psychiatric treatment nor was there any evidence that clinicians at Sachem House recommended psychiatric treatment as part of father's aftercare. Mantell, having reached the same diagnostic conclusions as Coleman and Spitz, testified that father's "best chance" of dealing with his personality issues was a commitment to sustained substance abuse treatment. As Mantell put it, "if father remains drug free, there was a fair chance that his other problems would correct themselves." Coleman did not disagree, stating that the "targeted outcome" was the cessation of father's substance abuse and, further, that the best indication of a successful rehabilitation by father would be a "sustained period of not using." There was obvious disagreement among the professional evaluators and clinician's as to the manner in which father's treatment should be fashioned and as to the order in which goals should be set.
Query, as to who is in a better position to assess father's mental health needs — a psychiatrist; a psychologist; a substance abuse, anger management or domestic violence clinician; or a department caseworker? Query as to what extent any of those professionals are expected to go in order to inspire an oppositional and defiant parent to access appropriate services'? Query as to where reasonableness ends and futility begins.? "The department is required only to make `reasonable efforts.' It is axiomatic that the law does not require a useless and CT Page 15334-em futile act." In re Antony B., supra, 54 Conn. App. 476.
This court concurs with Chief Justice McDonald's statement in his dissenting opinion In re Eden F., 250 Conn., 674, 719-720:
 I agree with the Appellate Court that the department, in seeking to terminate the right to parent, is capable of amassing substantial resources. "[I]n matters of termination of parental rights, the department occupies a superior position. . . . [T]he parties are by no means dealing on an equal basis. The parent is by definition saddled with problems: economic, physical, sociological, psychiatric, or any combination thereof. The agency, in contrast, is vested with expertise, experience, capital, manpower and prestige. Agency efforts correlative to their superiority [are] obligatory." (Internal quotation marks omitted.) In re Eden F., supra, 48 Conn. App. 312.
This court would add a caveat in that a parent's efforts should be correlative with his life experience, education and intelligence. Father as the target of agency services in this case is the antithesis of Ann F., who was the target of agency services in In re Eden, Ann F. was deemed by evaluators to lack both the emotional and intellectual capacity to parent a child. She had endured several psychiatric hospitalizations, was developmentally delayed and exhibited a "psychologically simple, childlike personality" (In re Eden, supra, 250 Conn. 700). Father, in great contrast, is not only college educated, receiving straight "A's", but studied pre-law for two years and completed a five year post graduate course in three years. While interrupting his higher education, he achieved ranking of third in a sales force of three thousand and ran his own sales company for a year. He has been a licensed, practicing chiropractor for more than a decade and, for a three year period (1994-1997) was able to amass $250.000 to sustain his successful high speed motorcycle racing avocation.[13] Father is no Ann F., who required all the expertise and support that the department could muster to have a chance at developing the skills to parent Eden. All father needed to do was to cooperate with the department and the many service providers to which he was referred by the department. All father needed to do, as Spitz reported, was to direct his intelligence and energy toward attaining an appropriate father and son relationship and to commit himself to that goal.[14] The services were there for the taking, they were plentiful, they were appropriate.
Father is also unlike the respondent father in In re Vincent B., CT Page 15334-en73 Conn. App. 637 (2002). In that case, the court determined that the trial court erred in concluding that the department had made reasonable efforts to reunite the respondent father with this child. At trial, a department social worker testified that at the time the initial petition was filed, the department had already decided not to offer the father further services was based on its prior experience with him. The Appellate Court noted that although the father had not availed himself of services in the past pertaining to his other children, he had voluntarily entered into a long term substance abuse program even before the commissioner filed the neglect petition as to Vincent B., and eventually success full completed the program. Moreover, he also obtained counseling for anger management and depression. Thus, he took steps which "presented the department with a window of opportunity [after his completion of these programs] during which reasonable efforts at reunification should have been made." Id., 644. That case is also distinguishable because unlike the record in this case in In re Vincent B., "[t]he record shows no evidence of relapses in [the] areas [for which father obtained treatment]." Id.
The department lacks the ability and authority to compel a parent to access services where the parent consistently and defiantly refuses to do so. In re Natalia G., 54 Conn. App. 800, 807 (1999). This court finds by clear and convincing evidence that the department exerted reasonable efforts to get father to do what he needed to do for himself and for Lucas. Father rebuffed the department in its many attempts. It was father's conduct that caused those efforts to fail and a court to conclude, on two occasions, that further efforts would not be appropriate. After a review of all of the evidence, this court agrees with that conclusion. The court also finds by clear and convincing evidence that father was unwilling and unable to benefit from any reunification efforts made by the department.
 B. Failure to Rehabilitate
As indicated, the petitioner alleges that father has failed to achieve the level of rehabilitation necessary to be a responsible parent to his child. Before this court reaches the issue of whether termination of mother and father's parental rights is in the best interests of said child, the petitioner must prove by clear and convincing evidence, as to father, the statutory ground alleged.
 In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and in fact usually dictate the outcome, in termination proceedings the statutory CT Page 15334-eo criteria must be met before termination can be accomplished and adoption proceedings begun. (Internal quotation marks omitted.) In re Eden F., supra, 250 Conn. 689.
Section 17a-112 (j) (3) (B) (i) allows for the involuntary termination of parental rights when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . ." (Internal quotation marks omitted.) In re Stanley D., 61 Conn. App. 224, 229
(2000).
"To terminate parental rights for failure to achieve rehabilitation, both prongs of the test incorporated in § 17a-112 (j) must be met: one, that the parent has failed to achieve rehabilitation and two, that there is no reason to believe that the parent could assume a responsible position in the life of the child within a reasonable time, considering the age and needs of the child." (Emphasis in original.) In re DanuaelD., 51 Conn. App. 829, 843 (1999).
Our Supreme Court has defined "rehabilitation" as follows:
 `Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.' `Rehabilitate' means to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, fall short of that which would reasonably encourage a belief that at some future date she can assume a CT Page 15334-ep responsible position in her child's life.
(Citations omitted; internal quotation marks omitted.) In re Eden F., supra, 250 Conn. 706.
The statute mandates that the court consider "some future date" insofar as parental rehabilitation is concerned, as reasonably achievable, given the child's age and the child's particular needs. A parent's personal rehabilitation is to be determined, in part, by the extent to which he or she has complied with the specific steps issued by the court, which provide a warning to the parent as to the possible consequences of the failure to comply. In re Shyliesh H., 56 Conn. App. 167, 179 (1999). The steps signed by father on April 19, 2000, and on January 24, 2001, each contained the following affirmation located just below Judge Mack's signature and just above that of father:
 As the above-named respondent, I hereby agree to cooperate withe the above conditions approved and ordered by the court and recognize that non-compliance with these steps result in modification of the existing order or disposition. I acknowledge that failure to achieve these specific steps will increase the chance that a petition may be filed to terminate my parental rights permanently so that my child may be placed in adoption. I understand that I should contact my lawyer and/or DCF worker if I need help in reaching any of these steps. (Emphasis added.)
In assessing rehabilitation, "the critical issue is not whether the parent has improved [his] ability to manage [his] own life but whether [he] has sufficiently achieved the ability to meet the particular needs of [his child]." (Internal quotation marks omitted.) In re Shyliesh H., supra, 56 Conn. App. 180. The court must review the past and present status of Lucas and view the parenting abilities of father from a historical perspective. See In re Tabitha P., 39 Conn. App. 353, 361
(1995).
In a recent case decided in this court, Judge Levin referred to the exception that applies to Practice Book § 33-3(a) when failure of a parent to rehabilitate is alleged as the statutory ground for termination:
 A claim of failure to rehabilitate implicates a judicially created exception to the Practice Book Rule, § 33-3 (a), that [i]n the adjudicatory CT Page 15334-eq phase, the judicial authority is limited to events preceding the filing of the petition or the latest amendment." "Despite Practice Book § 33-3(a) and case law regarding termination proceedings generally, we have determined that with regard to termination petitions brought under § 17a-112 (c) (3) (B), [now § 17a-(j) (3) (B)], the trial court may in the adjudicatory phase, properly consider facts and events that occur after the filing date of the petition in determining whether a respondent has achieved a sufficient degree of personal rehabilitation within the meaning of the statute. . . . In the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Citations omitted; emphasis in original.) In re Latifa K., 67 Conn. App. 742, 748-49, 789 A.2d 1024.
In re Samantha C., Superior Court, Child Protection Session at Middletown, (July 18, 2002, Levin, J.) (32 Conn.L.Rptr. 559, 562.)
1. Father's Rehabilitative Status as of the Adjudication Date (November29, 2001)
Prior to assessing father's rehabilitative status, it would be helpful to the court's analysis to mention the concerning behaviors, practices and lifestyle from which father required rehabilitation. What did father need to correct so as to be in a position to assume a responsible parental role in Lucas' life? When the department initially became involved, shortly after the child's birth in the fall of 1999, and when the department became reinvolved in the spring of 2000, the presenting problems were the same. Both parents continued to use and abuse illegal drugs. The parental relationship was both co-dependent and conflicted by verbal and physical abuse. Father regularly used cocaine and marijuana and abused alcohol. He had a criminal record attesting to previous conflicted relationships. He denied his substance abuse and denied any physical violence toward mother. His anger was directed not only to mother, but to department personnel. Mantell, referring to the presenting problems characterized the environment as an "unhealthy situation" for Lucas and observed that a parent's abuse of alcohol and/or drugs detracts from his or her ability to provide appropriate child care. Father's attorney, client and family friend testified that father was "totally CT Page 15334-er irresponsible, and cared for no one: and that "he [father] was the end of his universe."
The protective supervision conditions ordered by the court in April, 2000, spelled out for father what he needed to do. Those court orders included counseling for anger and domestic violence and appropriate evaluation, testing and treatment for substance abuse. Over the ensuing six months, despite Lucas' removal to foster care in August, 2000, father's record of compliance with the court's conditions was poor as evidenced by his testing history, numerous changes in employment and refusals to accept department referrals. As earlier described herein, father's first attempt to deal with his substance abuse was in October, 2000, when he participated in the two week holistic program at Mountainside — nearly thirteen months after the initial involvement of the department and six months after protective supervision was ordered. While in this non-accredited program, father smoked marijuana. Two months after leaving the program, he enrolled in his first relapse prevention program through New Perceptions, made "moderate progress" and relapsed with cocaine and marijuana in May and July, 2001 — relapses which resulted in a therapeutic recommendation for more intensive treatment which father refused. Significantly, during this connection with New Perceptions father failed to attend, three times, the psychiatric appointment arranged by his therapist.
At the time of Lucas' commitment in January, 2001, the court added parenting education to the steps father needed to follow. The goal of the department at that time was parental reunification. In an effort to achieve that goal, therapeutic supervised visitation was arranged with TEEG from February through August. Although father's attendance and behavior at visitation was appropriate, he remained for the therapeutic discussions on only half of the occasions and was too busy with other concerns to take the time to assimilate the parenting knowledge which was offered.
In October, 2001, two months after the court approved a permanency plan calling for the termination of his parental rights, father enrolled in the Quinebaug program from which he was unsuccessfully discharged after which he relapsed with cocaine and marijuana.
As of November 29, 2001, the date of the termination petition, father had not enrolled in any program that would address his anger and history of violent relationships. Father, for the most part, rebuffed any attempts to improve his parental abilities. Despite making some attempts to benefit from substance abuse counseling and treatment, father continued to use illegal drugs and to abuse alcohol. Despite attempts by CT Page 15334-es his therapist to appropriately address father's mental health issues, father refused to cooperate in the effort. This court finds that as of the adjudication date, father was no closer to achieving that level of rehabilitation necessary to properly and safely parent Lucas than he was at the time of the order of protective supervision and at the time of the child's commitment to the department. In re Passionique I.,44 Conn. Sup. 551, 564 (1996); In re Hector L., 53 Conn. App. 359, 367
(1999). This court, therefore, finds that the petitioner has proven by clear and convincing evidence the first prong of the statute, namely, the failure of father to achieve the requisite rehabilitation level.
2. Post Adjudicatory Events
The court must now address the second statutory prong and make a determination as to whether, given a reasonable time and given the age and needs of his child. Father will be able to assume a responsible position in Lucas' life. As noted, in its consideration of this foreseeability issue, the court may rely on post adjudicatory events.
In order to properly consider the second prong the court must address two questions posed by the statute. The first question is whether father is capable of achieving the degree of personal rehabilitation necessary for him to assume a responsible position in his child's life. If that question is resolved in the affirmative, the next question is whether that achievement can be accomplished within a reasonable time, considering Lucas' age and needs.
In order to address the first question, the court must assess father's rehabilitative efforts after the filing of the termination petition. Within two weeks of the filing dare, father participated daily in the program at Sachem House for a month. At discharge his prognosis was "fair" and aftercare was recommended through New Perceptions. The department referred father to the relapse prevention program as well as the OIC domestic violence program, in January and February, 2002, respectively. However, father did not seriously connect with New Perceptions until May, 2002, after he had been arrested for drunken driving and after he had relapsed with both cocaine and marijuana. Father did not enroll in the domestic violence program until ordered to do so by his probation officer. As noted, thereafter, in June, father tested positive for marijuana on two occasions. When father first saw Coleman, one month prior to commencement of trial, father reported to the evaluator that his motivation for his recent commitment to address his drug problem "with real seriousness" was his arrest for drunken driving, not the desire to be an appropriate parent to his son.[15]
CT Page 15334-et
Father disclosed to both Coleman and Spitz that during his twenty year usage of cocaine, his longest period of abstinence was from six to eight months. Coleman testified that the number of years one has abused substances affects the length of treatment. Both professionals agreed that father's prognosis for rehabilitation was "good" if father remained committed to his mental health and substance abuse therapies and if father ceases his use of drugs and alcohol. Although Spitz, after five sessions with father, reported his mental health progress as "noticeable," he confirmed that treatment could last up to one year. Despite father's engagement with New Perceptions for three months (as of the commencement of trial) the therapist at New Perceptions opined that father's prognosis was "fair." As noted, Mantell would not even consider father as a placement source for Lucas until father achieved one year of total sobriety with no use of alcohol, marijuana or cocaine. Since father's last positive test was June 28, 2002, if he remained drug and alcohol free, the one year benchmark could be reached by July, 2003. Moreover, even if father reached that goal of a year of sobriety, his abstinence would only exceed his previous longest period of abstinence by four months. Any relapse with alcohol or drugs would, of course, restart the one year clock. This court agrees with Spitz that father possesses "significant potential" to achieve rehabilitation, however, that potential can not be fully realized until, at the very least, eight months into Lucas' future at which time Lucas will have been in foster care for nearly three years.
3. The Age and Needs of the Child
Lucas is now three years old and has been in continuous foster care since he was eleven months old — more than two thirds of his life. In order for Mantell's minimum benchmark to be achieved, Lucas would have to wait another eight months in temporary foster care, another eight months of not reaching his goal of a permanent stable placement with a caretaker who provides the safety, the care and the love to which is entitled. The key question, therefore, in order to properly address the second prong under the statutory ground alleged, is whether the attainment of Lucas' goal should be deferred in order to permit father the opportunity to attain his goal of one year of total sobriety? Should Lucas be compelled by this court to continue to be placed in the foster care system with all its uncertainties so that father may have more time to address issues which should have been addressed long before the commencement of trial? Is allowing father more time to achieve the requisite rehabilitation worth the risk to Lucas that his current stable, nurturing placement could be lost? This court is compelled to answer all three question in the negative. CT Page 15334-eu
The evidence clearly establishes that Lucas has thrived in his current placement where he has been since August, 2000. He has established a bond and connection with his foster parents and is happy and content with their extended family. The foster parents have expressed their deep love for Lucas and are ready, willing and able to adopt him. Under the totality of the circumstances of this case, father's needs must be subservient to those of Lucas. This court therefore finds that the petitioner has proven by clear and convincing evidence that since the finding that Lucas was a neglected child on December 20, 1999, father has Failed to achieve such a degree of personal rehabilitation as would encourage this court to believe that within a reasonable time, given Lucas' age and need for stability and permanency, father could assume a responsible position in his life. Subparagraph (p) of section 17a-112
provides that:
 The provisions of this section shall be liberally construed in the best interests of any child for whom a petition under this section has been filed.
V. DISPOSITION
Now that the court has found in the adjudication stage that the petitioner has proven the statutory ground alleged by clear and convincing evidence, this court must consider whether termination of the respondents' parental rights is in the best interest of Lucas. The burden remains with the petitioner who must convince the court that termination is, in fact, in the child's best interest. In making its determination as to best interest, the trial court may take into account not only events preceding the filing of the present petition, but may consider all events up to the conclusion of the trial. Practice Book § 33-3. Each case must be decided on its particular facts and circumstances as it has been held that the determination of whether to terminate parental rights is a highly fact-specific process. See In re Shane P., 58 Conn. App. 244,254.
"The desire and right of a parent to maintain a familial relationship with a child cannot be separated from the desire and best interest of a child either to maintain or to abandon that relationship, or the interest of the state in safeguarding the welfare of children. These legitimate interests of parent, child and state require a balancing of the factors involved in those interests. . . . In every case involving parental rights, a struggle exists between parents and the state to determine what is in the child's best interest, the child being the focus of the struggle." (Internal quotation marks omitted.) In re Dorrell R.,64 Conn. App. 455, 467 (2001). CT Page 15334-ev
"`The trial court is vested with broad discretion in determining what is in the child's best interests. Presutti v. Presutti, 181 Conn. 622,627, 436 A.2d 299 (1980); Ridgeway v. Ridgeway, 180 Conn. 533, 541,429 A.2d 801 (1980).' Schult v. Schult, 241 Conn. 767, 777-78, 699 A.2d 134
(1997). Conducting a best interest analysis is not a narrow concept restricted to compelling reason or to fully reuniting the parent with the child. Rather, it is `purposefully broad to enable the trial court to exercise its discretion based upon a host of considerations.' In re BruceR., [234 Conn. 194, 206 (1995).]" In re Alissa N., 56 Conn. App. 203, 208
(1999) cert. denied, 252 Conn. 952 (2000).
 B. As to Lucas
Of necessity, the court has already referred to Lucas' current placement in its analysis of the second prong of the failure to rehabilitate statutory ground. A best interests analysis, however, requires more detail.
The current foster mother, Christine K., testified that when the child first arrived at her home in August, 2000, Lucas, at age eleven months, was not walking or talking and had difficulty chewing food. His motor skills were underdeveloped. The foster mother, therefore, arranged for the child to be evaluated through the Birth to Three program, that subsequently and appropriately addressed those problems. Lucas commenced the Head Start program as the trial began. Foster mother reports that he is very smart and "way above's the levels for his age. Lucas is somewhat small in stature, has an asthmatic condition and has experienced some difficulty with his gait. All of this child's needs, educational, medical, physically therapeutic, and emotional have been appropriately met by his foster parents for over two years. Foster mother testified that he is a happy child who sings all the time and loves to mimic whatever the foster father does. For those two years, Lucas has been a central member of an extended foster family which includes two grandchildren and one on the way. Prior to Head Start, Lucas was in daycare as both foster parents are employed full time. On the weekends, in the summer, Lucas and members of the extended family stay at a campground in a trailer owned by the foster parents. The foster parents are in their early fifties and have been foster parents for fourteen years. They have opened their home to dozens of abused and neglected children, however, for sixteen months, Lucas has been the only child residing with them. They own a spacious one family dwelling in which Lucas has his own room. Father testified that Lucas was "healthy and well cared for." Jutras stated that the child has "thrived" in the foster home. Both foster parents are bonded to Lucas and he to them. They "love CT Page 15334-ew him deeply" and he returns their love. The foster parents desire to adopt Lucas without further delay. The department supports the adoption which would cement the stability which Lucas requires and is entitled to attain.
 C. As to Mother
Lucas was removed from mother's care on three separate occasions due to her cocaine addition and conflicted relationship with father. Despite some engagement in outpatient treatment in 1999, a brief stay at Stonington Institute in 2000 and additional outpatient treatment through United Services in 2001, mother was unable to gain control over her addiction and continued to use cocaine. Further referrals to recommended intensive inpatient programs were made by the department in early 2002. Appointments were scheduled by the department at Quinebaug and Sachem House which were not kept by mother. In May 2002, mother did enroll in the Sachem House program, however, shortly thereafter, she disconnected therefrom. Mother has changed both her residence and her employment numerous times since the termination petition was filed and her life has become more unstable. She has since been arrested in several occasions and in June, 2002, reported to the department that she received a suspended sentence and probation for larceny.
During his initial evaluation in August 2000, Mantell reported that Lucas was "drawn to mother in an easy and comfortable way." During his second evaluation in March, 2002, Mantell, in recommending reunification with mother, noted the strong mother-child bond and concluded that "it would be a shame if the mother did not rehabilitate and could not once again resume care of Lucas." Mother has not rehabilitated and, two days into the trial, gave up any further commitment to do so when she voluntarily consented to the termination. This court finds by clear and convincing evidence that termination of mother's parental rights is in Lucas' best interest and compliments mother for making the difficult decision in this regard.
 D. As to Father
In order to properly address the crucial decision as to whether termination of father's parental rights is in Lucas' best interest, the court will first examine the nature of that relationship as established by the testimonial and documentary evidence. Father admitted that he was "overwhelmed" and "overworked" when Lucas was born and that, as a consequence thereof, he did not play an active role in his child's life. Father stated that Lucas' birth put a "strain on his business." as mother managed the chiropractic office, and a "strain on the relationship." CT Page 15334-ex Father was compelled to work sixty-five hours a week on construction jobs and at his office in order to support his family and pay the mortgages on his two houses. Mantell asked mother to describe the effects of drugs on father's parenting. Mantell reported her answer:
 She answered that Phil loves his son but he has never done a lot for him. She said Phil is not the kind of dad that gives baths. He never had to do parenting. She did it and did not mind. She loves the child so much. Phil did not get to know him as much as she did. (Emphasis added.)
During his first evaluation, Mantell reported, based on the evaluator's observations, that father exhibited "a less than satisfactory attachment to the child." Eighteen months thereafter, Mantell emphasized the "superior parental competence" and greater bond that mother demonstrated as compared to father. Mantell observed that Lucas seemed more comfortable with father during the second evaluation, but reported that there was little physical touching and that father seemed "strained at play." As stated earlier herein, the TEEG visitation supervisor observed that over the course of twenty visits in seven months, father's visits were, from Lucas' perspective, "playtime."
The evidence clearly establishes that, during the eleven months of Lucas' life when he was not in the care of the department, father never performed a constructive parental role. He was overwhelmed when Lucas was born and left all the caretaking responsibilities to mother. Mother established a loving, nurturing, comfortable, parent-child connection with her son. Father, despite the fact the child tells him "I love you" and calls him "daddy," has never truly been a dad to Lucas and has not achieved, based on the clear and convincing evidence, anything close to the bond that existed between mother and child. This court does not question father's love for his son; a mutual, enjoyable and playful relationship does exist between father and son. Bonding and love, however, are not sufficient reasons, given all of the circumstances of this case, to deny the department's petition. In re Quanitra M.,60 Conn. App. 96, 106 cert. denied, 255 Conn. 903 (2000); In re AshleyS., 61 Conn. App. 658, 667, cert. denied, 255 Conn. 950 (2001).
This court has earlier herein described, in great detail, the numerous services offered to father by the department and the rejection of said services by father. Not until father was placed under the watchful eye of the criminal justice system and commenced this trial, did he begin to make his son his professed top priority in life. That most recent commitment is too late for Lucas who has achieved stability and who has CT Page 15334-ey bonded with his adoptive family. Father, due to his misalignment of priorities, has not demonstrated, despite many offered and available opportunities to do so, the long term, genuine and sustained commitment he needed to make to Lucas to become an appropriate parental resource. In reDeana E., 61 Conn. App. 197, 204 (2000), cert. denied, 255 Conn. 941
(2001). Lucas cannot afford to sacrifice his entitlement to a permanent, loving and stable family environment in order to keep father in his life.
This court finds that petitioner has proven by clear and convincing evidence that termination of father's parental rights is in Lucas' best interest.
VI. THE STATUTORY FACTORS
In a non-consensual termination, the court, in deciding whether terminating a parent's parental rights is in a child's best interest, is mandated to consider those factors provided in § 17a-112 (k) which serve as guidelines to assist the court. Proof of each factor by clear and convincing evidence is not required. In re Quanitra M., supra,60 Conn. App. 104. The court, therefore, in deciding to terminate father's parental rights, has considered the following:
1. The Timeliness, Nature and Extent of Services Offered:
Appropriate and timely services were provided to father by the department including professional evaluations: visitation services; substance abuse evaluations, testing and treatment; therapeutic services and case management. As previously described, the department continuously offered such services to father despite his oppositionality and belligerence. Until the filing of the termination petition in November, 2001, father did not complete any of the programs to which he was referred by the department. Thereafter, father did complete, on his own, the Sachem program and he currently participates in the after care program through New Perceptions. Father last tested positive for illegal drugs less than two months prior to commencement of trial.
2. Reasonable Efforts to Reunite
Such efforts are mandated by the Federal Adoption Assistance and Child Welfare Act and the Adoption and Safe Families Act of 1997,42 U.S.C. § 670 et seq., and Connecticut's termination statute, § 17a-112 (j) (1). This court has earlier herein found that the efforts the department made were consistent with the statutory mandates. CT Page 15334-fz
3. Fulfillment of Court-Ordered Obligations
This court has described herein father's lack of compliance with the statutorily mandated conditions issued in April, 2000, when protective supervision was ordered and the steps issued in January, 2001. In order to be considered as a parental resource for his son, father needed to address his two decade long abuse of marijuana and cocaine, his alcohol abuse and his conflicted and violent relationships with romantic partners. Father did not begin to appropriately address his drug abuse until his participation in the Sachem program in December, 2001 — nearly one year after Lucas was committed and nearly two years after first being ordered to do so. He did not begin to deal with his domestic violence issues until a program was ordered as part of his probation in April, 2002. Father did not even admit that he was abusing alcohol until an April, 2002 drunk driving arrest influenced his re-engagement with New Perceptions. As also described, father rejected efforts by the department and New Perceptions to connect him with mental health services and did not engage in mental health therapy until after the fourth day of trial.
4. The Feelings and Emotional Ties Between Father and Lucas and theFoster Parents and Lucas
Although father genuinely loves his son and although Lucas returns father's affection and enjoys his company, father's parental connection to Lucas falls far short of that established by mother with her son. The evidence clearly shows that the father-son relationship falls far short of that which should be evident between a father and his three year old child.
On the other hand, the evidence clearly establishes the existence of a strong parental bond between Lucas and his foster parents whom he calls "mommy" and "poppy." Lucas has looked to them for daily care and nurturing. They have, for in excess of two years, provided him with a stable, safe and secure familial environment and are committed to do so for the rest of their lives by adopting Lucas.
5. The Age of the Child
Lucas is currently three years of age. He has been out of his parents' care for twenty-seven months. General Statutes § 17a-111a (a) (1) mandates that the department file a termination petition after a child has been in temporary care for only fifteen months. For Lucas, the implementation of the permanency plan of termination and adoption is long overdue. Any impediments to attaining the same must be removed. Termination of the parental rights of both of his biological parents is a CT Page 15334-fa necessary step in that direction.
6. Father's Efforts to Adjust His Circumstances, Conduct and Conditions
The opportunity for father to do the things he had to do in order to become a parental source, for Lucas was open to him via compliance with the court-ordered steps and cooperation with the department relative thereto. First and foremost, father needed to admit that he was addicted to cocaine and marijuana, admit that he had a serious alcohol dependence and admit that he abused woman. All three of these behaviors seriously impeded his ability to appropriately parent Lucas and presented a dangerous and unhealthy environment for this child. Father did not admit that chemical substances controlled his life and adversely affected all aspects thereof until May, 2002, and did not assume responsibility for his abuse of romantic partners until July, 2002. Father did not admit that he needed to address his abuse of substances and his abuse of women needed to be addressed until Lucas had been out of parental care for nearly two years. Father did not reorder his priorities and consider his son's best interest until a month before the commencement of trial. His recent efforts to modify his anti-social conduct and dangerous behaviors, though laudable, are much too late for Lucas whose best interests demand that he have permanency now.
7. The Extent to Which a Parent Has Been Prevented From Maintaining aMeaningful Relationship With the Child by the Unreasonable Act or Conductof the Other Parent of the Child, or the Unreasonable Act of any OtherPerson or by the Economic Circumstances of the Parent
Neither the unreasonable act or conduct of mother nor the unreasonable act of any other person nor economic circumstances has prevented father from maintaining a meaningful relationship with his child. Mother and father have no one to blame but themselves for the permanent removal of Lucas from their lives.
According to mother, prior to Lucas' removal parental care, the respondents spent $300 per week to support their drug addiction and $250,000 in a three year period to support that addiction and father's motorcycle racing. In light of these disclosures, father's claims to the department, to the service providers and to this court that he could not afford the minimal cost of substance abuse and mental health therapy, are not credible.
VII. CONCLUSION
This court finds, by clear and convincing evidence, that the CT Page 15334-fb termination of the parental rights of both parents of Lucas is in his best interest. He has been in his current foster home for over two years and has been cared for, loved and nurtured by two adults who have a long term stable relationship and who desire to adopt him. Lucas has bonded with the foster parents and is happy and content. Lucas is entitled to have this placement made permanent.
The respondents have been provided with many opportunities and have been offered the benefits of many therapeutic services since Lucas was first removed from their care over three years ago. Their failure to accept what has been offered has cost the respondents the loss of each other and the loss of their child.
VIII. ORDERS
Based on the foregoing, it is:
ORDERED that the parental rights of Michelle L., her consent having been accepted on August 13, 2002, by this court, and of Phillip D., because of his failure to achieve that degree of rehabilitation referred to in § 17a-112 (j), be and are hereby terminated with respect to their minor child, Lucas D.
ORDERED that the commissioner of the department of children and families is hereby appointed statutory parent for Lucas D. who shall submit to the Superior Court for Juvenile Matters at Willimantic, within thirty days of this judgment, a case plan, and thereafter, such further reports as may be required by law until adoption by the foster parents is finalized.
 ___________________ WILSON J. TROMBLEY CHILD PROTECTION SESSION